**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 18, 2009

Charles R. Fulbruge III
Clerk

No. 08-10918

STANLEY SHEPHERD

Plaintiff–Appellee Cross-Appellant

v.

DALLAS COUNTY

Defendant–Appellant Cross-Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:05-CV-1442

Before JONES, Chief Judge, and GARZA and STEWART, Circuit Judges.
EDITH H. JONES, Chief Judge:

Stanley Shepherd, a pretrial detainee, suffered a stroke and permanent disability due to the failure of the Dallas County Jail to administer the pills he had to take to ameliorate his chronic hypertension. That failure, Shepherd showed below, was not an unintended error but the predictable result of a *de facto* policy that denied inmates adequate care for chronic conditions. At summary judgment, the district court ruled that Shepherd's § 1983 claim was best characterized as a challenge to his conditions of confinement, and the jury

subsequently awarded him $890,336 in damages. Dallas County appeals, contending, *inter alia*, that the district court erred in so characterizing Shepherd's claim and in instructing the jury. Because this is the rare case in which a plaintiff demonstrated deficiencies in the conditions of confinement that amounted to punishment before he was judged guilty and thus violated due process of law, *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1872 (1979), the district court's judgment is AFFIRMED.

## I. BACKGROUND

On October 4, 2003, Stanley Shepherd was booked into the Dallas County Jail as a pretrial detainee. At intake, he informed a nurse at the jail that he had hypertension and had been taking Clonidine twice daily to treat that condition.

In his first two weeks at the jail, Shepherd requested Clonidine several times—one nurse practitioner recorded that he "wants and insists on Clonidine"—and, after a high blood-pressure reading on October 14, 2003, he was prescribed a different medication. Despite frequent complaints, he waited weeks between doses, was not monitored, and received no other medical treatment.

On November 27, Shepherd was brought to the jail clinic complaining of a severe headache. His blood pressure was high—165/117. Dr. Kathryn Flangin

ordered that Shepherd be given one dose of Clonidine and that his blood pressure be checked for three days.

Four days later, on December 1, Shepherd's blood pressure read 181/133, a level considered a "hypertensive emergency." He was given nitroglycerine and a prescription for twice-daily doses of Clonidine.

On December 3, Shepherd experienced a second hypertensive emergency, with his blood pressure reading 242/132. At that time, a nurse noted on Shepherd's chart that he "had not received his Clonidine as ordered." He was administered an initial dose, which proved effective.

For the next seven weeks, Shepherd received no medical treatment. His medication was not dispensed as prescribed, and no medical provider checked his blood pressure. The record shows that he and his wife, who was aware of the situation, complained to jail staff and medical personnel about the lack of treatment. His wife, in particular, repeatedly expressed the concern that Shepherd would have a stroke if he did not receive his medication regularly.

Shepherd did not see a medical provider until January 22, 2004. Early that afternoon, he went to the nurse's station complaining of weakness on the left side of his body and hypertension. A nurse took his blood pressure, which was high, and reported it to Dr. Flangin, who ordered the nurses to monitor

Shepherd's blood pressure and administer doses of two drugs, Lasix and Lopressor. Shepherd was sent back to his cell, over his protests that he was not well.

An hour later, Shepherd was found lying on the floor of his cell, with slurred speech, sweating, and left-side weakness. He was immediately taken by ambulance to the hospital, where doctors concluded that he had suffered a stroke because of a hypertensive emergency. After 26 days in the hospital, he was discharged to a rehabilitation center, where he recuperated for several months.

Since his stroke, Shepherd has been permanently confined to a wheelchair, has lost most of his left-side functions, suffered impairment of his left-side sight and hearing, and has slurred speech.

In 2005, Shepherd filed suit against Dallas County seeking damages under 42 U.S.C. § 1983 for violations of his Fourteenth Amendment right to medical care while in custody, challenging both specific "episodic acts and omissions" and the "conditions of confinement." The district court granted summary judgment to the County on Shepherd's episodic acts claim, on the ground that he failed to identify any jail employee who had shown deliberate indifference to his plight, but it allowed his "conditions of confinement" claim to proceed to trial.

At trial, Shepherd presented extensive evidence on the jail's treatment of inmates with chronic illness. Witnesses, including the jail's Medical Director at the time of Shepherd's confinement, the jail's pharmacist, and an employee of the medical services contractor responsible for monitoring the jail's contract, testified that the jail's medical program was understaffed to the point that routine treatment could not be provided; that at times, no medical personnel were present at the jail; that fifty percent or more of prescriptions regularly went undelivered to inmates; that records concerning medication administration were regularly falsified; and that Dallas County officials had been repeatedly notified of these problems.

Two extensive reports entered into evidence buttressed Shepherd's claims. In December 2004, Dallas County retained Health Management Associates ("HMA") to perform a comprehensive review of the health services at the Dallas County Jail. The review was performed, and a report written, by a team led by Dr. Michael Puisis ("Dr. Puisis"), an expert in correctional health. Dr. Puisis made the following findings in his report to the County:

- The jail has "<u>no</u> capacity to diagnose illness at intake" (emphasis in the original). Further, "There is no policy or procedure for how inmates who come into the jail at intake

5

are to receive their medication or be referred to a physician." Overall, "only about 25% of incoming inmates with a chronic illness are actually physically seen by a physician following intake," with the result that "[p]atients with chronic illness . . . may never be adequately evaluated."

- "The sick call process in Dallas County Jail is not adequate and its steady state is that inmates, by attrition, leave the jail before being seen more frequently than being appropriately evaluated." Dr. Puisis found "multiple barriers to access" to care, including a dysfunctional "kite" system for inmate requests; the lack of timely review of health care requests by nurses; the unavailability of officers to bring inmates for health services; the lack of adequate capacity to examine inmates who manage to appear at sick call; and understaffing of physicians.

- Monitoring of inmates with chronic conditions is "poor to non-existent." Specifically: "There are no policies, procedures or chronic care guidelines that are used in the management of chronic diseases. There is no mechanism to track individuals

who have a chronic illness . . . , and there is no mechanism in place to assign acuity to patients with chronic illness." Generally, inmates with chronic illness are seen only "when their conditions deteriorate to an urgent status"; inmates whose conditions have not yet reached that point "usually are discharged before being seen" by a doctor. The result of this system, according to Dr. Puisis's review of inmate medical charts, is "disease deterioration to the point of requiring hospitalization."

Dr. Puisis's findings were echoed in a 2006 report by the Department of Justice ("DOJ"). In on-site inspections in February and March 2006, the DOJ found that the jail "fails to adequately identify inmates' health needs through appropriate intake screening, thereby preventing inmates from receiving adequate care for acute or chronic needs." The jail "has no clinical practice guidelines for chronic and communicable diseases," including hypertension. It "fails to ensure that inmates receive thorough assessments and monitoring of their chronic illnesses." Care for inmates with chronic conditions is "plagued by delays in the treatment and administration of medication." Like Dr. Puisis, the DOJ found that the system for obtaining medical treatment was "inadequate"

due, in large part, to "significant" barriers to access, including a complete lack of any protocols for collecting, processing, distributing, logging, and triaging medical requests. The jail regularly lost track of inmates with chronic illness and, overall, "fails to provide adequate treatment for their needs." The DOJ was particularly critical of the jail's system of administering medication, as a result of which "inmates routinely miss doses of life-sustaining medications." The DOJ identified numerous cases where inmates suffered or died because of the jail's inadequate treatment of chronic conditions. It concluded that the jail was operating in violation of inmates' constitutional right to adequate medical care.

The jury rendered a verdict for Shepherd, and a judgment was entered in his favor. Both parties appealed.

## II. DISCUSSION

Dallas County raises four issues in this appeal: (1) whether the district court erred in classifying the plaintiff's § 1983 claim as an attack on conditions of confinement; (2) whether the district court erred in failing to require the jury to find that the County adopted or maintained any unconstitutional conditions of confinement with the intent to punish pretrial detainees; (3) whether the jury's verdict was supported by sufficient evidence; and (4) whether the district court erred in allowing the entirety of the DOJ report, including its conclusions,

to be admitted into evidence. In a protective cross-appeal, Shepherd challenges the district court's grant of summary judgment to the County on his episodic acts or omissions claim.

## A. Conditions of Confinement

Dallas County first contends that the district court erred in classifying the plaintiff's § 1983 lawsuit as an attack on conditions of confinement rather than the episodic acts or omissions of particular jail officials.

Constitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a "condition of confinement" or as an "episodic act or omission." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644–45 (5th Cir. 1996) (en banc). If the plaintiff has properly stated a claim as an attack on conditions of confinement, he is relieved from the burden of demonstrating a municipal entity's or individual jail official's actual intent to punish because, as discussed below, intent may be inferred from the decision to expose a detainee to an unconstitutional condition. A condition is usually the manifestation of an explicit policy or restriction: the number of bunks per cell, mail privileges, disciplinary segregation, etc. *See Scott v. Moore*, 114 F.3d 51, 53 n.2 (5th Cir. 1997) (en banc) (listing cases deemed to state challenges to conditions of confinement). In some cases, a condition may reflect an unstated or *de facto*

policy, as evidenced by a pattern of acts or omissions "sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice." *Hare*, 74 F.3d at 645. Proving a pattern is a heavy burden, one that has rarely been met in our caselaw. Further, to constitute impermissible punishment, the condition must be one that is "arbitrary or purposeless" or, put differently, "not reasonably related to a legitimate goal." *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S. Ct. 1861, 1874 (1979).

More often, however, a plaintiff's claim, properly characterized, faults specific jail officials for their acts or omissions because the plaintiff cannot establish the existence of an officially sanctioned unlawful condition. In these cases, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Scott*, 114 F.3d at 53. Because the focus of the claim is one individual's misconduct, the detainee is required to prove intent—specifically, that one or more jail officials "acted or failed to act with deliberate indifference to the detainee's needs." *Hare*, 74 F.3d at 648.

10

Dallas County contends that the district court erred in classifying Shepherd's lawsuit by denying it summary judgment on his conditions-of-confinement claim.[1] Shepherd's case, the County argues, is no more than an episodic-acts-or-omissions claim: if his rights were violated, specific acts of specific County employees were to blame, not County policy.

In support of this argument, the County points to several cases found to state episodic acts rather than conditions-of-confinement claims. In *Scott*, this court held that a § 1983 lawsuit over a sexual assault, which the plaintiff argued was the result of constitutionally inadequate staffing, could not be classified as a conditions claim because the plaintiff did not suffer from that alleged unlawful condition but from an individual's specific act, the assault, committed on a single occasion. *Scott*, 114 F.3d at 53–54. Similarly, in *Sibley*, this court held that the lawsuit of a mentally disturbed detainee who had been allowed to pluck out his eyeballs while left alone and shackled was properly classified as an episodic act or omission because, again, the plaintiff's injuries were caused by specific alleged

---

[1] Dallas County further argues that the district court did not properly classify Shepherd's lawsuit because it considered both claims on the merits, granting the County summary judgment on the episodic-acts-or-omissions claim and allowing the conditions-of-confinement claim to proceed to trial. This procedure, however, was an entirely appropriate manner of choosing between two alternative claims when the evidence clearly supported one and not the other. Further, the district judge is no more required to classify a § 1983 lawsuit than any other case in which multiple theories are pled in the alternative. In the present case, as discussed *infra*, a fact issue existed only on the conditions of confinement claim.

acts or omissions. *Sibley v. Lemaire*, 184 F.3d 481, 487–88 (5th Cir. 1999). And in *Hare*, this court held that a § 1983 lawsuit concerning the suicide of a detainee was not properly classified as an attack on the general conditions and practices of detainment because the claim was premised on jail officials' episodic acts or omissions. *Hare*, 74 F.3d at 643–45, 650.

Shepherd's claim, by contrast, does not implicate the acts or omissions of individuals but the jail's system of providing medical care to inmates with chronic illness. His original complaint contains the full theory of the case: The jail's evaluation, monitoring, and treatment of inmates with chronic illness was, at the time of Shepherd's stroke, grossly inadequate due to poor or non-existent procedures and understaffing of guards and medical personnel, and these deficiencies caused his injury. Shepherd relied on evidence showing that the inadequate treatment he received in a series of interactions with the jail's medical system inevitably led to his suffering a stroke.[2] To demonstrate the existence of an unlawful condition, he presented extensive independent evidence on the jail's treatment of inmates with chronic illness. This evidence included a comprehensive evaluative report commissioned by the County, the DOJ report,

---

[2] Because no single individual's error actually caused his hypertensive decline into a stroke, Shepherd's protective cross-appeal, challenging the district court's grant of summary judgment to the County on his episodic-acts-or-omissions claim, must fail.

affidavits from employees of the jail and its medical contractor attesting to the accuracy and applicability of the reports, and a plethora of additional documentary evidence. From this evidence, the court could reasonably infer a *de facto* jail policy of failing properly to treat inmates with chronic illness.

Further, the condition that Shepherd alleged to be unlawful is cognizable as punishment under *Bell* and its progeny. "Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell,* 441 U.S. at 537, 99 S. Ct. at 1873. "[T]he effective management of the detention facility . . . is a valid objective that may justify imposition of conditions and restrictions of pretrial detention." *Id.* at 540, 99 S. Ct. at 1875. Detainment itself, however, requires that the State provide for inmates' basic human needs:

> When the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*Hare*, 74 F.3d at 639 (quoting *DeShaney v. Winnebago County Department of Soc. Serv.*, 489 U.S. 189, 200, 109 S. Ct. 998, 1005–1006 (1989)). Thus, isolated examples of illness, injury, or even death, standing alone, cannot prove that

13

conditions of confinement are constitutionally inadequate. Nor can the incidence of diseases or infections, standing alone, imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks. Allegations of insufficient funding are similarly unavailing. Rather, a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights. Here, Shepherd demonstrated that serious injury and death were the inevitable results of the jail's gross inattention to the needs of inmates with chronic illness. In the absence of any legitimate penological or administrative goal, this amounts to punishment.

We therefore reject the County's claim that the district court improperly classified Shepherd's lawsuit at summary judgment.

## B. Intent To Punish

Dallas County next contends that the district court erred in failing to require the jury to find that any unlawful conditions of confinement were adopted or maintained by the County with an intent to punish.

The law, however, is clear that an official intent to punish may be presumed when the plaintiff, as in this case, attacks general conditions,

14

practices, rules, or restrictions of pretrial confinement. *Bell* at 538–39, 99 S. Ct. at 1873–1874. A showing of express intent to punish is not required. Instead, such intent may be presumed where a policy is otherwise senseless:

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition [of pretrial confinement] is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Bell* at 539, 99 S. Ct. at 1874 (footnote omitted).

Nonetheless, Dallas County urges that a plaintiff challenging conditions of confinement must prove intent—specifically, deliberate indifference. But as this court, sitting en banc, explained in *Hare*, the jail officials' individual states of mind are not a disputed issue in such cases:

> In true jail condition cases, an avowed or presumed intent by the State or its jail officials exists in the form of the challenged condition, practice, rule, or restriction. A State's imposition of a rule or restriction during pretrial confinement manifests an avowed intent to subject a pretrial detainee to that rule or restriction. Likewise, even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices. Thus, a true jail condition case starts with the assumption that the State intended to cause the pretrial detainee's alleged constitutional deprivation.

*Hare, supra*, 74 F.3d 644–45. This standard is "functionally equivalent to a deliberate indifference inquiry," *id.* at 643, because, in a true jail conditions case, the plaintiff has shown either an official policy, intentionally adopted, or a series of "acts or omissions . . . sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition." *Id.* at 645. Only when the plaintiff has made such a showing may the jury reasonably presume that the government acted with the requisite intent to punish.

The district court properly instructed the jury on this point. Shepherd, the jury was charged, had the burden of "demonstrat[ing] the existence of an identifiable intended condition or practice" that was "not reasonably related to a legitimate governmental objective." Such a practice, the court instructed (tracking the language of *Hare*), may be either "an established rule or restriction" or acts or omissions "sufficiently extended or pervasive . . . to prove an intended condition or practice." Evidence showing only "isolated instances of inadequate medical care," the court clearly instructed, would be insufficient. These instructions do not, as Dallas County argues, permit a finding of municipal liability premised upon negligence or strict liability. Consistent with the law, they allowed the jury to infer intent to punish only when a municipality

knowingly subjects a detainee to inhumane conditions of confinement or abusive

jail practices.[3]

_____

[3] It is unnecessary to quote the court's entire instruction, but the most salient parts that refute the County's criticism are as follows:

> To establish that his Fourteenth Amendment rights were violated because of the general conditions of his confinement, Shepherd must prove by a preponderance of the evidence that the general level of medical care provided to pretrial detainees during the time he was detained at the Dallas County Jail was not reasonably related to a legitimate governmental objective and therefore punished him, in violation of his Fourteenth Amendment due process rights. In other words, he must prove that the level of medical care provided generally at the Jail was so inadequate that it resulted in a serious deprivation of his basic human needs, and that the level of care provided was not reasonably related to a legitimate governmental objective.
> Pretrial detainees are not entitled under the Constitution to the best medical care available or to the level of medical care that may be available to persons who are not detained or incarcerated, provided the level of medical care they receive does not seriously deprive them of their basic human needs, or the level of medical care is reasonably related to a legitimate governmental objective.
> To prove that Shepherd received an inadequate level of medical care as a result of general conditions of confinement, it is not sufficient to show that he received isolated instances of inadequate medical care, including medical malpractice or unsuccessful medical treatment, or suffered from episodic acts or omissions of jail officials, unless they are indicative of a systemwide problem. In other words, if Shepherd relies on an act or omission of a particular jail official to prove his claim, the act or omission must implement either a rule or restriction, or it must otherwise demonstrate the existence of an identifiable intended condition or practice. If Shepherd is unable to point to such an established rule or restriction, then he must show that the jail official's acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice.

17

## C. Sufficiency of the Evidence

Dallas County maintains that the district court erred in denying its motion for judgment as a matter of law on Shepherd's conditions-of-confinement claim because Shepherd's evidence was legally insufficient. The County's arguments in support of this contention in large measure mirror those already disposed of: that Shepherd's evidence concerned only episodic acts and that he failed to present evidence of intent. Cloaking these contentions in a new guise does not make them any more persuasive. The County additionally argues that the evidence presented by Shepherd did not concern the time period of his confinement, October 4, 2003, through January 22, 2004, and that he therefore failed to establish the state of conditions during that period.

We review a district court's ruling on a motion for judgment as a matter of law *de novo*. In an action tried by jury, a motion for judgment as a matter of law is a challenge to the legal sufficiency of the evidence supporting the jury's verdict. The jury verdict must be upheld unless "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *McBeth v. Carpenter*, 565 F.3d 171, 176 (5th Cir. 2009).

Dallas County, however, waived its right to appeal the sufficiency of the evidence because it did not file a motion under Federal Rule of Civil

Procedure 50(b) for judgment as a matter of law after the jury's verdict. "[A] Rule 50(b) motion is necessary to preserve an argument for appellate review even when a Rule 50(a) motion was denied after all the evidence was presented." *Downey v. Strain*, 510 F.3d 534, 543 (5th Cir. 2007) (citing *Unitherm Food Sys., Inc. v. Swift-Eckrich*, Inc., 546 U.S. 394, 400–01, 126 S Ct. 980, 163 (2006)). Here, the record shows that Dallas County made a Rule 50(a) motion at the close of Shepherd's case and again at the close of its own case. It failed, however, to move for judgment as a matter of law or a new trial after the jury's verdict.

Accordingly, our review is limited to plain error. *Polanco v. City of Austin, Tex.*, 78 F.3d 968, 974 (5th Cir. 1996). Under this standard, "the question before this Court is not whether there was substantial evidence to support the jury verdict, but whether there was *any* evidence to support the jury verdict." *Id.*

Plainly, Shepherd has carried this minimal burden with extensive testimony from jail and UTMB employees on conditions present while he was in jail. For example, Dr. Steven Bowers, medical director of the Dallas County Jail at the time of Shepherd's detention, testified that jail conditions were consistent with those reported by Dr. Puisis in the HMA report and that the jail's medical services were inadequate. Paul Roach, the jail's clinical pharmacist at the time of Shepherd's detention, testified that the administration of medication at the

jail was so inadequate that, according to surveys he conducted, half or more of inmates did not receive their prescription medications. And Shepherd himself testified as to the conditions that he directly experienced.

The evidence is more than sufficient to insulate the jury's verdict from plain error.

### D. The Department of Justice Report

Finally, Dallas County argues that the district court erred under Federal Rule of Evidence 403 in admitting the DOJ Report into evidence.

In reviewing a district court's Rule 403 determinations, "we give great deference to the court's informed judgment and will reverse only after a clear showing of prejudicial abuse of discretion." *United States v. Peden*, 961 F.2d 517, 521 (5th Cir. 1992). This deference is appropriate because "Rule 403 . . . is an extraordinary measure [that] permits a trial court to exclude concededly probative evidence, and thus it should be used sparingly." *United States v. Clark*, — F.3d —, 2009 WL 2195985, at *11 (5th Cir. 2009). Thus, "[w]hen reviewing this exercise of discretion, we must look at the evidence in the light most favorable to the proponent, maximizing its probative value and minimizing its prejudicial effect." *Id*.

Rule 403 allows the exclusion of otherwise admissible evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." When the subject of this balancing test is a government report or other public record, the court must take care to ensure that Rule 403 does not undermine the policy in favor of the admission of such evidence that is embodied in Rule 803(8)(C). *See Moss v. Ole South Real Estate, Inc.*, 933 F.2d 1300, 1308–09 (5th Cir. 1991) (magistrate judge abused discretion under Rule 403 by excluding two trustworthy government evaluative reports on the grounds that the jury would find them confusing and accord their conclusions undue weight).

In the present case, Dallas County objected on Rule 403 grounds to the admission of the entire DOJ report regarding the County's provision of medical care at the jail and the constitutionality of jail conditions. The County makes three arguments supporting this claim. First, the report's authors may have lacked the requisite skill or expertise to opine on jail conditions. Second, the report had little relevance because it does not purport to address jail conditions at the time of Shepherd's detention. And third, the report was unduly prejudicial because the jury afforded its conclusions undue weight, effectively "ced[ing]" its factfinding duty to the Department of Justice.

Addressing these arguments in order, we first reject the County's attack on the credibility of the report's authors. Questions of credibility are properly for the jury. *United States v. Thompson*, 615 F.2d 329, 332–33 (5th Cir. 1980) ("Rule 403 does not permit exclusion of evidence because the judge does not find it credible."). The jury was carefully instructed on its duty to evaluate the credibility of the witnesses and evidence before it.

Second, the report's relevance cannot be seriously doubted. Shepherd alleged that medical care at the jail was constitutionally inadequate, and the report's recitation of facts and findings provide strong support for that claim. The findings that the County now contests (the record shows that County officials did not challenge them in meetings with the DOJ in Washington) are well-grounded in facts obtained through personal observation of the jail during several visits, interviews of jail personnel, and reviews of jail policies and procedures, incident reports, grievances, and medical records. Though the report was released in 2006, it describes incidents going back to 2002. In particular, it reports numerous specific incidents of failure to provide adequate medical care that occurred shortly before, during, and shortly after the period of Shepherd's detention from late 2003 to early 2004. Further, several witnesses testified that

the report accurately reflected jail conditions at that time or that conditions had changed little between late 2003 and early 2006.

Third, the report's findings were not unfairly prejudicial in terms of the weight that a jury would accord them. Rule 803(8)(C) contemplates the admission of reports, such as this, containing "factual findings resulting from an investigation made pursuant to authority granted by law." The findings in the DOJ report were undoubtedly prejudicial to the County's cause, but they were probative as well. The County merely labels them "unprincipled, conclusory and simplistic," a characterization reasonably rejected by the trial court and, outside of this litigation, by the County itself. The court did not abuse its discretion in refusing to exclude this relevant evidence.

## IV. CONCLUSION

For the reasons discussed above, the judgment of the district court is **AFFIRMED.**