**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
January 20, 2012

No. 10-31037

Lyle W. Cayce
Clerk

RONNIE L. MORGAN, JR.,

Plaintiff–Appellee

v.

CORNEL HUBERT, Warden, Elayn Hunt Correctional Center

Defendant–Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:06-CV-5700

Before JOLLY, DeMOSS, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:[*]

In the aftermath of Hurricane Katrina, nearly 8,000 prisoners were evacuated from Orleans and Jefferson Parishes to Elayn Hunt Correctional Center ("EHCC"), which was then run by Warden Cornel Hubert, the Appellant. Appellee Ronnie Morgan Jr. was one such prisoner. When Morgan arrived at EHCC, he asked to be segregated from the general prison population due to his protective-custody status. He did not receive protective custody, but was instead placed in the recreation yard with the other evacuees, and thirty minutes after

_____

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-31037

being placed in the yard, he was assaulted. He brought suit under 42 U.S.C. § 1983, claiming that Hubert violated his Eighth Amendment right to be protected from inmate violence. Hubert moved for summary judgment based on qualified immunity, and the district court denied that motion. Because we find that Hubert was not deliberately indifferent, we REVERSE the district court's denial of summary judgment to Hubert.

## I. BACKGROUND

### A. Factual Background

When Hurricane Katrina hit New Orleans and the surrounding area on August 29, 2005, Morgan was an inmate at the Orleans Parish Criminal Sheriff's Office's House of Detention. Morgan had been sentenced to federal custody, but at that time was being held in protective custody by Orleans Parish. When the levees broke, the sheriffs of Orleans Parish and neighboring Jefferson Parish requested assistance from the Louisiana Department of Public Safety and Corrections ("DPSC"), then-headed by Richard Stadler.

EHCC was the closest state prison to New Orleans that did not suffer any major damage from Hurricane Katrina. Due to this, on the night of August 29, 2005, DPSC informed Hubert that Jefferson and Orleans Parishes would be evacuating to EHCC. EHCC was to be used primarily as a reception center from which prisoners would be dispatched to other DPSC state prisons. The first buses of evacuees from Jefferson Parish arrived just hours after DPSC informed Hubert of the evacuations. The evacuation of Jefferson Parish and then Orleans Parish continued around-the-clock for about four days, and the total number of evacuees that passed through EHCC was close to 8,000.

To deal with this massive evacuation, Hubert instituted a number of policies. Each prisoner was searched for weapons upon boarding a bus from New Orleans and searched again upon arrival at EHCC. Prisoners were given food, water, and, if necessary, clean clothing. The first-arriving Jefferson Parish

2

prisoners came with their records, and EHCC staff conducted classification procedures to identify the prisoners, paying special attention to medical and mental health needs. Once EHCC staff completed these procedures, they sent the evacuees to the large, main recreation yard, where Hubert felt it would be easiest to maintain order over the ever-increasing number of temporary inmates at EHCC.

Unlike those prisoners arriving from Jefferson Parish, the Orleans Parish prisoners did not arrive at EHCC with their records but showed up only with wristbands supposedly identifying them by name and charge. The major problem with the wristbands was that the Orleans prisoners traded them, leading to a significant number of effectively anonymous prisoners. At the beginning of the Orleans Parish evacuation, EHCC staff tried to do limited classification of the Orleans evacuees by name, medical or mental health needs, and any concerns expressed by the prisoner. Although it is disputed why this limited classification of Orleans prisoners stopped, it is undisputed that on the third day of evacuation (September 1, 2005) even these limited classification procedures were suspended. Hubert claims that after the suspension of the classification procedures, however, he instructed his staff to report any special needs request for protective custody up the chain of command, adding that such requests would be investigated, and if substantiated, would be accomodated.

It was on this third day of the evacuation that Morgan arrived at EHCC from Orleans Parish. Upon his arrival to EHCC, Morgan informed prison officials that he was a protective-custody inmate and that his safety would be at risk if he were placed in the recreation yard alongside thousands of general population prisoners. According to Morgan, all that EHCC prison officials did in response to this information was advise him not to tell other prisoners that he was a protective-custody prisoner. Morgan and other protective-custody prisoners asked EHCC officials to talk to the Orleans Parish guards on their bus

to verify that they needed protection, but EHCC officials chose not to do so. When Morgan and the other protective-custody prisoners were led from the bus to the recreation yard, the general population inmates called to one another about the arrival of protective-custody prisoners and began gathering at the gate. Another protective-custody prisoner from Morgan's bus, Wayne Priestly, told the EHCC official he could see his enemies and would be attacked if placed on the field. Despite this, the protective-custody inmates were ordered onto the field; Priestly was stabbed within seconds. Within thirty minutes, Morgan was stabbed in the head by an unidentified inmate. He made his way to the gate and asked the guards for help. The EHCC guards refused to help Morgan and left him bleeding on the field overnight; Morgan does not allege that he was attacked again that night.

## B.    Procedural Background

On September 1, 2006, Morgan filed this suit under § 1983 alleging a violation of his rights under the Eighth Amendment. Hubert filed a motion to dismiss based on qualified immunity. The magistrate judge recommended granting this motion as to Morgan's official capacity claims but denying the motion as to Morgan's individual capacity claims, and the district court did so. Morgan appealed that order to the Fifth Circuit. After oral argument, a panel of this Court held that the relevant law was clearly established, and that the guards' actions put Morgan at substantial risk (based on the facts alleged in the complaint). *Morgan v. Hubert*, 335 F. App'x 466, 471 (5th Cir. 2009). The panel held, however, that additional specificity was required to evaluate the reasonableness of Hubert's actions in light of the clearly-established constitutional right. *Id*. at 472–73. The case was remanded to the district court for limited discovery as to qualified immunity.

Morgan complied with a district court order to file a heightened *Schultea* pleading that included more specificity. *See Schultea v. Wood*, 47 F.3d 1427 (5th

No. 10-31037

Cir. 1995) (en banc).  The district court transformed Hubert's motion to dismiss into a motion for summary judgment, and afforded both parties additional time to submit additional evidence.  After considering their submissions, the district court denied the motion.  Hubert timely filed this interlocutory appeal.

## II.  JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction to hear an interlocutory appeal from an order denying qualified immunity to the extent it turns on a question of law.  *Behrens v. Pelletier*, 516 U.S. 299, 311 (1996).  We must "'accept the plaintiff's version of the facts as true' and may review *de novo* only the purely legal question of whether 'the district court erred in concluding as a matter of law that officials are not entitled to qualified immunity on [that] given set of facts.'" *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006) (quoting *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004) (en banc)) (alteration in original).

## III.  DISCUSSION

We use a two-prong test to determine whether an official is entitled to qualified immunity: "(1) whether the plaintiff has alleged a violation of a clearly established constitutional right; and (2) if so, whether the defendant's conduct was objectively unreasonable in light of the clearly established law at the time of the incident." *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000) (citation omitted).  In the context of the  Eighth Amendment guarantee of protection from inmate violence, this second prong has two subparts. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  First, the plaintiff must show that there was a "substantial risk of serious harm." *Id.* (citation omitted).  Second, the plaintiff must show that the prison official was deliberately indifferent to that risk.  This is shown by proving "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.  Hubert

5

No. 10-31037

challenges the district court's denial of qualified immunity under the first prong and both subparts of the second prong.

## A.    Clearly Established Law

The previous panel in this case held that the Eighth Amendment guarantee of protection from inmate violence was clearly established. *Morgan*, 335 F. App'x at 471. This holding, therefore, is the law of the case. *See Fuhrman v. Dretke*, 442 F.3d 893, 896 (5th Cir. 2006) ("The law of the case doctrine provides that 'an issue of law or fact decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal.'") (citation omitted). This rule is grounded in the policy of finality—once an issue has been decided in the litigation it should not be reexamined—and is subject to few exceptions. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988); *Furhman*, 442 F.3d at 897 (enumerating the exceptions). Because none of the exceptions are applicable to the present case, we decline, as Hubert has requested, to reexamine the previous panel's holding that the Eighth Amendment guarantee of protection from inmate violence was clearly established.

## B.    Substantial Risk of Serious Harm

To survive a qualified immunity claim, Morgan must show that Hubert's actions (or omissions) "resulted in the denial of the minimal civilized measure of life's necessities." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 589 (5th Cir. 2004) (internal quotation marks and citations omitted).** Those

---

** Morgan urges us to dispose of Hubert's second challenge to the district court's denial based on the law of the case as well because the previous panel stated: "We are of the opinion that placing Morgan, a prisoner in protective custody at the time, on the field with the general prison population created an objective and substantial risk to his safety." *Morgan*, 335 F. App'x at 471. This opinion was based only on the facts as alleged in Morgan's complaint. As this appeal comes to us on summary judgment with a supplemented record, we cannot rely on the law of the case. *Cf. Furman*, 442 F.3d at 897 (explaining that where the evidence is substantially different on the second appeal, law of the case is excepted).

6

necessities include "food, clothing, shelter, medical care, and reasonable safety." *Shephard v. Dall. Cnty.*, 591 F.3d 445, 454 (5th Cir. 2009) (quoting *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996)). The Supreme Court has noted that "[p]rison conditions may be 'restrictive and even harsh,'" *Farmer*, 511 U.S. at 833 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)), but that conditions must not include prisoners "[b]eing violently assaulted," as that serves no legitimate purpose. *Id.* at 834 (citation omitted). Morgan's assault while in the recreation yard at EHCC is undisputed and unquestionably rises to the level of serious harm. The closer question, as the previous panel acknowledged, is "whether placing Morgan in a field with the general prison population raised a substantial risk of that harm." *Morgan*, 335 F. App'x at 471.

We recognize that "[c]lassification of prisoners is a matter left to the discretion of prison officials." *McCord v. Maggio*, 910 F.2d 1248, 1250 (5th Cir. 1990) (citing *Wilkerson v. Maggio*, 703 F.2d 909 (5th Cir. 1983)). Though admittedly there are varying levels of protective custody in the DPSC system, the goal of all protective custody is "to provide enhanced safety for likely targets of inmate violence," whether through segregation from the general population or other measures. James E. Robertson, *The Constitution in Protective Custody: An Analysis of the Rights of Protective Custody Inmates*, 56 U. Cin. L. Rev. 91, 91 (1987). When an inmate has been previously classified as needing protective custody, placing that inmate into the general population would make the protective-custody inmate susceptible to a risk of harm. If this were not the case, the original assignment into protective custody would have been unnecessary.

The nature of that risk—whether it is substantial or not—in any given case is ultimately a question of context and is susceptible to evaluations of "contemporary standards of decency." *Horton v. Cockrell*, 70 F.3d 397, 401 (5th Cir. 1995) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)) (internal

quotation marks omitted). Hubert urges us to consider the treatment afforded to Morgan in the context of the aftermath of Hurricane Katrina and to consider the hardships faced by the non-prison population during that time. While we recognize that the situation in those early days after the storm hit was devastating on a grand scale and we appreciate the efforts undertaken by prison officials in orchestrating such a large evacuation with minimal issues, the comparison to the non-prison population is inapt here. Such concerns and considerations better fit within the deliberate indifference subpart of the constitutional violation prong.

The more pertinent context is the one that faced Morgan as he stepped off the bus. Morgan informed the guards that he was a protective-custody inmate. Members of the general population in the recreation yard were threatening the protective-custody prisoners. Morgan and other protective-custody prisoners were wearing clothing that made them stick out from the rest of the prisoners. Additionally, Priestly, another protective-custody prisoner, was attacked immediately upon entering the recreation yard. In this context, the risk of serious harm that Morgan faced by being placed in the recreation yard with the general prison population was substantial.

## C.    Deliberate Indifference

"Deliberate indifference [lies] somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer*, 511 U.S. at 836 (citation and internal quotation marks omitted). As we noted in *Gobert*, this is an "extremely high standard to meet," 463 F.3d at 346, because it requires showing that the prison official "knows of and disregards" the substantial risk of serious harm facing the inmate. *Farmer*, 511 U.S. at 837. The core of this requirement is that the prison official had knowledge of the risk faced by inmates and responded unreasonably. *See id.* at 845. This is not something that Morgan can prove. After suspending normal classification procedures, Hubert

told his staff to report any requests for protective custody up the chain of command for further investigation. We have previously held that prison officials who referred prisoners' claimed needs for protective custody for further investigation were not deliberately indifferent. *See Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004). In light of the chaos that Hubert faced due to Hurricane Katrina, we cannot say that his policy of referring protective-custody claims for further investigation was deliberately indifferent. *See Terry v. Hubert*, 609 F.3d 757, 763 (5th Cir. 2010) ("We cannot ignore the implication favoring immunity in the context in which the normal operating procedures must yield, because of necessity, to improvisation," especially in light of the devastation wrought by Hurricane Katrina.). Therefore, we find that Hubert was entitled to qualified immunity and REVERSE the district court's denial of Hubert's motion for summary judgment.

REVERSED.