W. EUGENE DAVIS, Circuit Judge: *
This case arises from the death of 26 year old Jason Ray Brown in the Wichita County Jail in Texas while he was a pretrial detainee. This is the second appeal in this case. In the prior appeal, Brown v. Callahan, 623 F.3d 249 (5th Cir.2010) (Callahan ), a panel of this court held that the Wichita County Sheriff Thomas Callahan was entitled to qualified immunity. Based largely on that decision, the district court later granted summary judgment for Wichita County and Dr. Daniel Bolin, the physician in charge of the jail, on the plaintiffs’ federal civil rights claims. The plaintiffs now appeal that judgment, which we affirm.
I.
Because the district court decided this case on summary judgment, this court “must view the facts and the inferences to be drawn from them in the light most favorable to [the plaintiffs].” Wyatt v. Hunt Plywood Co., Inc., 297 F.3d 405, 409 (5th Cir.2002); see also Hare v. City of Corinth, Miss., 74 F.3d 633, 636 (5th Cir.1996) (en banc). Accordingly, the facts below present the summary judgment evidence most favorable to the plaintiffs.
On Thursday July 22, 2004 around 3:00 p.m., Brown was arrested and brought to the Wichita County Jail. Brown told the booking officer at the jail that he was under the care of a local specialist, Dr. Joseph Dean, for several serious medical conditions, including autoimmune chronic hepatitis, esophageal varices (enlarged veins in the lower part of the esophagus), anemia, jaundice, and splenomegaly (an enlargement of the spleen). Brown was placed in the jail’s general population. At 4:00 p.m., Brown complained that he felt nauseous and had vomited a small amount of blood. Nurse Michelle George contacted Brown’s pharmacist, who gave her Brown’s list of prescribed medications, which were prescribed to be taken every few hours. The pharmacist also told her that Brown had not picked up his medications in several months. Nurse George attempted to reach Brown’s physician, Dr. Dean. George then spoke with her supervisor, Nurse Rose Ingram, who told her not to order the medications until the patient was seen by the jail’s medical officer, Dr. Daniel Bolin. Dr. Bolin was under contract with Wichita County to be the physician in charge of providing medical care to inmates at the jail, as well as supervising the jail’s nursing staff and providing written standing orders for the nursing staff.
The following day, July 23, shortly before midnight, Brown vomited a large amount of blood. Other inmates contacted officers for help. Corporal Green and Officer Sours responded. They found a large puddle of blood next to Brown. Officer *311 Sours described the puddle of blood as covering an area 1 to 1.5 feet in width and 2 to 2.5 feet in length. Brown told Officer Sours that he had gastric ulcers, that he took a significant amount of medications each month, and that he had received 27 units of blood transfusions over the preceding six months. Corporal Greene called Kaye Krajca, who was a nurse at the jail, and explained the situation to her. Krajca told him to give Brown a tube of liquid antacid per “standing orders.”
Brown took the antacid but soon other inmates alerted the officers that Brown was complaining that he was in a lot of pain. Officer Sours called Krajca again and she asked whether anyone actually saw Brown throw up blood. Sours told her, “Kaye, I had to clean it up.” Krajca told the officers to give Brown a phener-gan suppository for the nausea from Dr. Bolin’s standing orders. Around 2:25 a.m. (now July 24), the officers returned to Brown’s cell to administer the suppository but found Brown moaning and incoherent. The officers called Krajca at home again and told her that Brown was incoherent. Krajca advised that she was en route.
When Krajca arrived at the jail, Brown was largely unresponsive. Krajca had Brown moved to medical solitary and administered the suppositories. During a cigarette break, Krajca asked Sours, “Do you know what kind of ass chewing I would get from Dr. Bolin if I sent him to the hospital in the good health that he is in?”
On Saturday, July 24, between 3:12 a.m. and 11:30 p.m., detention officers allegedly monitored Brown through a slot in the cell door. At approximately 11:30 p.m., Brown was found unresponsive and without a pulse by the two officers. Krajca advised them to call emergency services. The medical response team reported that Brown had died quite some time prior to their arrival. The autopsy report indicates that Brown died from a massive gastrointestinal hemorrhage.
The plaintiffs, Brown’s parents, sued Wichita County; the Wichita County Sheriff; Dr. Bolin; and nurses and officers at the jail. In addition to state law negligence claims, the plaintiffs brought claims under 42 U.S.C. § 1983, alleging that the defendants violated Brown’s Fourteenth Amendment right to due process through their deliberate indifference to his serious medical needs. The district court denied summary judgment for the County, and denied summary judgment for Dr. Bolin and the Sheriff, concluding that they were not entitled to qualified immunity. Sheriff Callahan appealed and this court reversed, concluding that Sheriff Callahan was entitled to qualified immunity. Callahan, 623 F.3d 249. Callahan disclaimed any opinion on the liability of Dr. Bolin, ‘Whether Dr. Bolin, jail nurses, or other staff violated Brown’s rights is not before us; the Browns’ case against Dr. Bolin and Nurse Krajca, awaits trial pending the outcome of this appeal, and we express no opinion on its merits.” Callahan, 623 F.3d at 253. However, in light of that decision, the County and Dr. Bolin asked the district court to reconsider its prior orders denying their motions for summary judgment on the issue of qualified immunity. The court granted reconsideration, and relying heavily on Callahan, reversed its prior orders and granted summary judgment for the County and Dr. Bolin on the plaintiffs’ § 1983 claims. The plaintiffs timely appealed.
II.
This court reviews de novo the grant of summary judgment. Callahan, 623 F.3d at 253. “The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact *312 and the movant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a). The issue presented in the motions for summary judgment decided by the district court concerned the defense of qualified immunity asserted by the defendants. As we stated in Callahan,
A qualified immunity defense alters the usual summary judgment burden of proof. See Michalik v. Hermann, 422 F.3d 252, 262 (5th Cir.2005). Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official’s allegedly wrongful conduct violated clearly established law. Id. The plaintiff bears the burden of negating qualified immunity, id., but all inferences are drawn in his favor.
The qualified immunity defense has two prongs: whether an official’s conduct violated a constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation. Manis v. Lawson, 585 F.3d 839, 843 (5th Cir.2009). A court may rely on either prong of the defense in its analysis. Id. If the defendant’s actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant’s actions were “objectively reasonable” in light of “law which was clearly established at the time of the disputed action.” Collins v. Ainsworth, 382 F.3d 529, 537 (5th Cir.2004) (citations omitted). Whether an official’s conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury. Williams v. Bramer, 180 F.3d 699, 703 (5th Cir.1999). To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. Brown v. Miller, 519 F.3d 231, 236 (5th Cir.2008). The unlawfulness of the defendant’s actions must have been readily apparent from sufficiently similar situations, but it is not necessary that the defendant’s exact act have been illegal. Id. at 236-37. An official’s actions must be judged in light of the circumstances that confronted him, without the benefit of hindsight. Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In essence, a plaintiff must allege facts sufficient to demonstrate that no reasonable officer could have believed his actions were proper. Babb v. Dorman, 33 F.3d 472, 477 (5th Cir.1994).
Id. at 253.
III.
As a pretrial detainee, Brown had a clearly established Fourteenth Amendment right not to be denied medical care as a result of deliberate indifference. Hare, 74 F.3d at 650. Brown appeals the grant of summary judgment on the issue of qualified immunity both as to Dr. Bolin and as to Wichita County. Determining what standard to apply hinges on whether Brown’s claims as a pretrial detainee are properly classified as a condition of confinement or as an episodic act or omission. Id. at 644. A condition of confinement case occurs when a constitutional attack is made on the “general conditions, practices, rules, or restrictions of pretrial confinement.” Id. A condition is usually the manifestation of an explicit policy or restriction, such as the number of bunks per cell, mail privileges, disciplinary segregation, etc. Shepherd v. Dallas County, 591 F.3d 445, 452 (5th Cir.2009), citing Scott v. Moore, 114 F.3d 51, 53 n. 2 (5th Cir.1997) (en banc). In the absence of an explicit policy, a plaintiff may prove a condition reflected by an unstated policy established *313 by evidence of a pattern of acts or omissions “sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials to prove an intended condition or practice.” Id., citing Hare, 74 F.3d at 645.
More often, however, a plaintiffs claim, properly characterized, faults specific jail officials for their acts or omissions because the plaintiff cannot establish the existence of an officially sanctioned unlawful condition. In these cases, “an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.” Scott, 114 F.3d at 53.

Id.

We conclude that this case presents an episodic acts complaint. The specific complaint in this case is that Nurse Krajca, faced with Brown’s critical medical situation, should have sent Brown to the hospital or at least called Dr. Bolin for advice. Brown alleges that Krajca’s conduct was a consequence of Dr. Bolin’s and the County’s policy of: (1) placing inadequately trained vocational nurses in the position to make critical medical decisions for the inmates without adequate guidance, training or supervision; and (2) with the knowledge that the supervising physician intimidated nurses to prevent them from calling him after hours. However, the claim starts with Nurse Krajca’s determination that Brown’s medical condition could be handled in the jail by use of the standing orders for medication without sending him to the hospital. See Scott, 114 F.3d at 53-54; Sibley v. Lemaire, 184 F.3d 481, 487-88 (5th Cir.1999).
The record lacks evidence of a systemic failure of medical care of the type that we have found to present a unconstitutional condition of confinement. In Shepherd, the plaintiff indicted the entire jail medical system as a cause of his stroke. 591 F.3d at 453. The jail had a history of problems “evaluating], monitoring, and treating] inmates with chronic illness ... due to poor or non-existent procedures and understaff-ing of guards and medical personel.” Id. Shepherd also presented independent evidence of the deficiencies including investigative reports from the County and Department of Justice and affidavits from employees of the jail and its medical contractor. For example, the jail’s pharmacist testified that “the administration of medication at the jail was so inadequate that, according to surveys he conducted, half or more of inmates did not receive their prescription medications.” Id. at 456.
Similarly, in Duvall v. Dallas County, the plaintiff contracted a severe infection that was resistant to typical antibiotic treatment. 631 F.3d 203, 206 (5th Cir. 2011). The plaintiff presented evidence that the jail had a “bizarrely high incidence” of the infection compared to other jails and that the County was aware of the problem, continued to house inmates in the face of the inadequately controlled infection, and knew how to control the infection but failed to implement known measures to eradicate or control the situation. Id. at 208. This ease lacks similar evidence of a systemic failure of emergency medical care at the Wichita County Jail. We are therefore persuaded that the district court properly analyzed this case as an episodic acts case.
IV.
We turn next to the issue of whether the district court properly granted summary *314 judgment on the issue of qualified immunity in favor of Dr. Bolin. In order to overcome the qualified immunity defense in an episodic acts case, Brown must prove that the official “acted or failed to act with deliberate indifference to the detainee’s needs.” Hare, 74 F.3d at 648. To establish deliberate indifference, the plaintiff must establish that the official knew of and disregarded an excessive risk of inmate health or safety. Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Hare, 74 F.3d at 648-49 (applying Farmer standard for convicted inmates in a condition of confinement case to pretrial detainee’s claim of episodic act). The official “must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.” Id. Because Dr. Bolin was not directly involved in the events surrounding Brown’s death and “liability under the doctrine of respondeat superior is not cognizable in § 1983 actions,” the plaintiffs’ claims against Dr. Bolin are premised on supervisory liablity. See Cozzo v. Tangipahoa Parish Council-Pres. Govt., 279 F.3d 273, 286 (5th Cir.2002).
An official
not personally involved in the acts that deprived the plaintiff of [his] constitutional rights is liable under section 1983 if: 1) the [supervisor] failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff’s rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiffs constitutional rights.
Id., (citing Thompson v. Upshur Cnty., Tex., 245 F.3d 447, 459 (5th Cir.2001)). Proof of a single instance of constitutional violations resulting from alleged inadequate training will not ordinarily support a plaintiff’s claim that lack of training caused the violation of his constitutional rights. Id. at 286-87. Rather, a pattern of similar violations is ordinarily required to sustain a plaintiff’s burden of proof. Id.
Supervisory liability can also be established without direct participation in the alleged events “if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.” Thompkins v. Belt, 828 F.2d 298, 304 (5th Cir.1987)(internal quotations and citations omitted). An official policy is:
1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [government entity] ... or by an official to whom the [entity] has delegated policy-making authority; or
2. A persistent, widespread practice of ... officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents [the entity’s] policy.
Cozzo, 279 F.3d at 289, quoting Johnson v. Moore, 958 F.2d 92, 94 (5th Cir.1992). Existence of a constitutionally deficient policy cannot be inferred from a single wrongful act. Thompkins, 828 F.2d at 304.
Brown’s evidence on summary judgment paints a picture of a system of medical care for prison inmates and detainees that has serious potential for the type of harm that befell Brown. Although the County has in place a General Order for Health Services, it was drafted by the Sheriff and the summary judgment evidence reflects that neither Dr. Bolin nor Nurse Krajca were aware of it. The General Order outlines circumstances in which an inmate should be transported for emergency med *315 ical care — including severe loss of blood. Dr. Bolin’s contract with the County placed him in charge of the medical care for the inmates and charged him with supervision of the professional activities of the nurses. However, he did not review the nurses’ decisions that occurred in his absence and performed no evaluations of the nurses’ performance. The nurses were the first line providers of health care and Dr. Bolin became involved when the nurses called him.
The nurses who were charged with the gatekeeping function between the inmates and Dr. Bolin or medical care other than what could be provided via the standing orders were LVNs, licensed vocational nurses. According to the Texas Occupations Code for Health Profession, V.T.C.A. § 301.002(5), nurses with this qualification are not trained to diagnose patients or do procedures.[1] Rather, they are qualified to assess a patient’s situation and report on the same. Id. Accordingly, Brown argues that allowing the LVNs to medicate detainees from the standing orders required them to perform medical care beyond their professional training. The summary judgment record also includes evidence that Dr. Bolin intimidated the nurses when they called him about inmate’s medical needs.
Nurse Krajca, who observed Brown’s condition, undoubtedly acted with deliberate indifference to Brown’s medical needs. However, to find that Dr. Bolin was deliberately indifferent, there must be evidence from which we can conclude that Dr. Bolin was aware that the failure to properly train or supervise the nurses or that his other policies and procedures for medical care at the jail created a substantial risk of harm to the detainees and then acted with deliberate indifference to that risk. Hare, 74 F.3d at 650. The deliberate indifference standard is high. Negligence or even gross negligence is not enough. Id. at 645. “[T]he correct legal standard is not whether the jail officer [Dr. Bolin] ‘knew or should have known,’ but whether they had gained actual knowledge of the substantial risk of [denial of appropriate medical care as a result of current jail staffing and policies] and responded with deliberate indifference.” Id.
The record contains no such evidence at the time of Brown’s death. Dr. Bolin had no knowledge of Brown’s medical problems before he died. The record contains no evidence of past instances *316 where inmates suffered harm due to improper nursing assessment, treatment from the standing orders, or failure to call Dr. Bolin due to fear of reprimand. It also contains no evidence that Dr. Bolin knew that the system of medical care at the jail, including staffing and decision making by LVNs, had been assessed as deficient by any reviewing authority. See Shepherd, 591 F.3d at 453. In fact, the jail passed State certification. Accordingly, the district court did not err in granting summary judgment for Dr. Bolin on the issue of qualified immunity.
V.
For similar reasons, we conclude that the district court did not err in granting summary judgment for Wichita County on the issue of qualified immunity. A plaintiff seeking to hold a municipality liable under § 1983 must put on evidence demonstrating that (1) a policymaker; (2) exercised deliberate indifference in promulgating an unconstitutional policy; and (3) the unconstitutional policy was a moving force in the violation of an individual’s constitutional rights. Piotrowski v. City of Houston, 237 F.3d 567, 578-79 (5th Cir.2001). Even if we assume that Dr. Bolin can be a policymaker for purposes of imputing liability on the County, Brown’s case fails for lack of evidence that the County exercised deliberate indifference in promulgating an unconstitutional policy. Id.
The existence of a constitutional violation and a municipality’s liability for that violation are two separate issues. Hare, 74 F.3d at 649, n. 4.
Different versions of the deliberate indifference test govern the two inquiries. Our opinion in this case makes clear that to prove an underlying constitutional violation in an individual or episodic case, a pre-trial detainee must establish that an official acted with subjective deliberate indifference. Once the detainee has met this burden, she has proved a violation of her rights under the Due Process Clause. To succeed in holding a municipality accountable for that due process violation, however, the detainee must show that the municipal employee’s act resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the detainee’s constitutional rights. See Farmer, 114 S.Ct. at 1981 (“It would be hard to describe the Canton understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective.”).

Id.

In Scott v. Moore, 114 F.3d 51, 54 (5th Cir.1997), this court analyzed whether the city’s failure to adopt a policy of additional staffing to prevent sexual abuse of female detainees amounted to objective deliberate indifference as follows;
First, there is no showing that the city had actual knowledge that its staffing policy created a substantial risk of harm to female detainees. To the contrary, the city had followed the same staffing procedures since the late 1970’s without any incident and had received no complaint of sexual assault by a jailer prior to this incident.
/¿.Further the jailers underwent a background investigation, medical exam and polygraph test which revealed no cause for concern. The specific jailer in question had served for four years as a commissioned police officer without incident and had been trained by experienced jailers in the official policies of the jail. See also Snyder v. Trepagnier, 142 F.3d 791, 799 (5th Cir.1998) (No evidence showing that the city was aware of the supposedly high stress levels in the New Orleans Police *317 Department or knowledge that the absence of a stress management program was likely to endanger the constitutional rights of its citizens.)
As stated above, the record contains no evidence of failure of the system of medical care at the Wichita County Jail that would indicate that the County was deliberately indifferent in maintaining that policy. Accordingly, we conclude that the district court did not err in granting summary judgment on the issue of qualified immunity in favor of the County.
VI.
Although we reach these conclusions based on the facts available to Dr. Bolin and the County at the time of Brown’s incarceration, this holding is not approval of the medical care provided by Dr. Bolin or the Wichita County Jail. As pointed out by the plaintiffs, there have been two documented cases of improper assessment by the nursing staff at the jail since Brown’s death which could be viewed as evidence that the nurses do not have the proper training to recognize critical medical situations. These incidents may be sufficient to put the Sheriff, Dr. Bolin and the County on notice that their present policies may be likely to endanger the constitutional rights of the inmates in the Wichita County Jail. However, based on the record in this case, we affirm the judgment of the district court granting qualified immunity to these defendants.
AFFIRMED.

 Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

. The Texas Occupations Code for Health Professions defines Vocational Nursing as follows:
§ 301.002. Definitions
(5) “Vocational nursing” means a directed scope of nursing practice, including the performance of an act that requires specialized judgment and skill, the proper performance of which is based on knowledge and application of the principles of biological, physical, and social science as acquired by a completed course in an approved school of vocational nursing. The term does not include acts of medical diagnosis or the prescription of therapeutic or corrective measures. Vocational nursing involves:
(A)collecting data and performing focused nursing assessments of the health status of an individual;
(B) participating in the planning of the nursing care needs of an individual;
(C) participating in the development and modification of the nursing care plan;
(D) participating in health teaching and counseling to promote, attain, and maintain the optimum health level of an individual;
(E) assisting in the evaluation of an individual’s response to a nursing intervention and the identification of an individual’s needs; and
(F) engaging in other acts that require education and training, as prescribed by board rules and policies, commensurate with the nurse’s experience, continuing education, and demonstrated competency.
V.T.C.A., Occupations Code § 301.002(5). (emphasis added).