# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 12, 2012

No. 11-10511
consolidated with
No. 11-10512

Lyle W. Cayce
Clerk

JANIS L. BROWN, Individually, and as Personal Representative of the
Estate of Jason Ray Brown, Deceased; BILLY RAY BROWN,

Plaintiffs-Appellants

v.

DANIEL H. BOLIN, in his Individual and Official Capacity,

Defendant -Appellee

consolidated with 11-10512

JANIS L. BROWN, Individually, and as Personal Representative of the
Estate of Jason Ray Brown, Deceased; BILLY RAY BROWN,

Plaintiffs-Appellants

v.

WICHITA COUNTY, TEXAS,

Defendant - Appellee

Appeals from the United States District Court
for the Northern District of Texas, Wichita Falls Division

Before DAVIS, SMITH and DENNIS, Circuit Judges.

No. 11-10511, cons. with 11-10512

W. EUGENE DAVIS, Circuit Judge:[*]

This case arises from the death of 26 year old Jason Ray Brown in the Wichita County Jail in Texas while he was a pretrial detainee. This is the second appeal in this case. In the prior appeal, *Brown v. Callahan*, 623 F.3d 249 (5th Cir. 2010) (*Callahan*), a panel of this court held that the Wichita County Sheriff Thomas Callahan was entitled to qualified immunity. Based largely on that decision, the district court later granted summary judgment for Wichita County and Dr. Daniel Bolin, the physician in charge of the jail, on the plaintiffs' federal civil rights claims. The plaintiffs now appeal that judgment, which we affirm.

I.

Because the district court decided this case on summary judgment, this court "must view the facts and the inferences to be drawn from them in the light most favorable to [the plaintiffs]." *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002); *see also Hare v. City of Corinth, Miss.*, 74 F.3d 633, 636 (5th Cir. 1996)(en banc). Accordingly, the facts below present the summary judgment evidence most favorable to the plaintiffs.

On Thursday July 22, 2004 around 3:00 p.m., Brown was arrested and brought to the Wichita County Jail. Brown told the booking officer at the jail that he was under the care of a local specialist, Dr. Joseph Dean, for several serious medical conditions, including autoimmune chronic hepatitis, esophageal varices (enlarged veins in the lower part of the esophagus), anemia, jaundice, and splenomegaly (an enlargement of the spleen). Brown was placed in the jail's general population. At 4:00 p.m., Brown complained that he felt nauseous and had vomited a small amount of blood. Nurse Michelle George contacted Brown's

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

2

pharmacist, who gave her Brown's list of prescribed medications, which were prescribed to be taken every few hours. The pharmacist also told her that Brown had not picked up his medications in several months. Nurse George attempted to reach Brown's physician, Dr. Dean. George then spoke with her supervisor, Nurse Rose Ingram, who told her not to order the medications until the patient was seen by the jail's medical officer, Dr. Daniel Bolin. Dr. Bolin was under contract with Wichita County to be the physician in charge of providing medical care to inmates at the jail, as well as supervising the jail's nursing staff and providing written standing orders for the nursing staff.

The following day, July 23, shortly before midnight, Brown vomited a large amount of blood. Other inmates contacted officers for help. Corporal Green and Officer Sours responded. They found a large puddle of blood next to Brown. Officer Sours described the puddle of blood as covering an area 1 to 1.5 feet in width and 2 to 2.5 feet in length. Brown told Officer Sours that he had gastric ulcers, that he took a significant amount of medications each month, and that he had received 27 units of blood transfusions over the preceding six months. Corporal Greene called Kaye Krajca, who was a nurse at the jail, and explained the situation to her. Krajca told him to give Brown a tube of liquid antacid per "standing orders."

Brown took the antacid but soon other inmates alerted the officers that Brown was complaining that he was in a lot of pain. Officer Sours called Krajca again and she asked whether anyone actually saw Brown throw up blood. Sours told her, "Kaye, I had to clean it up." Krajca told the officers to give Brown a phenergan suppository for the nausea from Dr. Bolin's standing orders. Around 2:25 a.m. (now July 24), the officers returned to Brown's cell to administer the suppository but found Brown moaning and incoherent. The officers called Krajca at home again and told her that Brown was incoherent. Krajca advised that she was en route.

3

No. 11-10511, cons. with 11-10512

When Krajca arrived at the jail, Brown was largely unresponsive. Krajca had Brown moved to medical solitary and administered the suppositories. During a cigarette break, Krajca asked Sours, "Do you know what kind of ass chewing I would get from Dr. Bolin if I sent him to the hospital in the good health that he is in?"

On Saturday, July 24, between 3:12 a.m. and 11:30 p.m., detention officers allegedly monitored Brown through a slot in the cell door. At approximately 11:30 p.m., Brown was found unresponsive and without a pulse by the two officers. Krajca advised them to call emergency services. The medical response team reported that Brown had died quite some time prior to their arrival. The autopsy report indicates that Brown died from a massive gastrointestinal hemorrhage.

The plaintiffs, Brown's parents, sued Wichita County; the Wichita County Sheriff; Dr. Bolin; and nurses and officers at the jail. In addition to state law negligence claims, the plaintiffs brought claims under 42 U.S.C. § 1983, alleging that the defendants violated Brown's Fourteenth Amendment right to due process through their deliberate indifference to his serious medical needs. The district court denied summary judgment for the County, and denied summary judgment for Dr. Bolin and the Sheriff, concluding that they were not entitled to qualified immunity. Sheriff Callahan appealed and this court reversed, concluding that Sheriff Callahan was entitled to qualified immunity. *Callahan*, 623 F.3d 249. *Callahan* disclaimed any opinion on the liability of Dr. Bolin, "Whether Dr. Bolin, jail nurses, or other staff violated Brown's rights is not before us; the Browns' case against Dr. Bolin and Nurse Krajca, awaits trial pending the outcome of this appeal, and we express no opinion on its merits." *Callahan*, 623 F.3d at 253. However, in light of that decision, the County and Dr. Bolin asked the district court to reconsider its prior orders denying their motions for summary judgment on the issue of qualified immunity. The court

No. 11-10511, cons. with 11-10512

granted reconsideration, and relying heavily on *Callahan*, reversed its prior orders and granted summary judgment for the County and Dr. Bolin on the plaintiffs' § 1983 claims.  The plaintiffs timely appealed.

## II.

This court reviews de novo the grant of summary judgment.  *Callahan*, 623 F.3d at 253.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The issue presented in the motions for summary judgment decided by the district court concerned the defense of qualified immunity asserted by the defendants.  As we stated in *Callahan*,

> A qualified immunity defense alters the usual  summary judgment burden of proof. See *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005). Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law. *Id*. The plaintiff bears the burden of negating qualified immunity, *id*., but all inferences are drawn in his favor.
>
> The qualified immunity defense has two prongs: whether an official's conduct violated a constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation. *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009). A court may rely on either prong of the defense in its analysis. *Id*.
>
> If the defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were "objectively reasonable" in light of "law which was clearly established at the time of the disputed action." *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004) (citations omitted). Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999). To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right. *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008). The unlawfulness of the defendant's actions must have been readily apparent from sufficiently similar situations, but it is not necessary that the defendant's exact act have been illegal. *Id.* at 236-37. An official's actions must be judged in light of the circumstances that confronted him, without the benefit of hindsight. *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). In essence, a plaintiff must allege facts sufficient to demonstrate that no reasonable officer could have believed his actions were proper. *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994).

*Id.* at 253.

III.

As a pretrial detainee, Brown had a clearly established Fourteenth Amendment right not to be denied medical care as a result of deliberate indifference. *Hare*, 74 F.3d at 650. Brown appeals the grant of summary judgment on the issue of qualified immunity both as to Dr. Bolin and as to Wichita County. Determining what standard to apply hinges on whether Brown's claims as a pretrial detainee are properly classified as a condition of confinement or as an episodic act or omission. *Id.* at 644. A condition of confinement case occurs when a constitutional attack is made on the "general conditions, practices, rules, or restrictions of pretrial confinement." *Id.* A condition is usually the manifestation of an explicit policy or restriction, such as the number of bunks per cell, mail privileges, disciplinary segregation, etc. *Shephard v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009), citing *Scott v. Moore*, 114 F.3d 51, 53 n.2 (5th Cir. 1997)(en banc). In the absence of an explicit policy, a plaintiff may prove a condition reflected by an unstated policy established by evidence of a pattern of acts or omissions "sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials to prove an intended condition or practice." *Id., citing Hare,* 74 F.3d at 645.

> More often, however, a plaintiff's claim, properly characterized, faults specific jail officials for their acts or omissions because the plaintiff cannot establish the existence of an officially sanctioned unlawful condition. In these cases, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Scott*, 114 F.3d at 53.

*Id.*

We conclude that this case presents an episodic acts complaint. The specific complaint in this case is that Nurse Krajca, faced with Brown's critical medical situation, should have sent Brown to the hospital or at least called Dr. Bolin for advice. Brown alleges that Krajca's conduct was a consequence of Dr. Bolin's and the County's policy of: (1) placing inadequately trained vocational nurses in the position to make critical medical decisions for the inmates without adequate guidance, training or supervision; and (2) with the knowledge that the supervising physician intimidated nurses to prevent them from calling him after hours. However, the claim starts with Nurse Krajca's determination that Brown's medical condition could be handled in the jail by use of the standing orders for medication without sending him to the hospital. *See Scott*, 114 F.3d at 53-54; *Sibley v. Lemaire*, 184 F.3d 481, 487-88 (5th Cir. 1999).

The record lacks evidence of a systemic failure of medical care of the type that we have found to present a unconstitutional condition of confinement. In *Shepherd*, the plaintiff indicted the entire jail medical system as a cause of his stroke. 591 F.3d at 453. The jail had a history of problems "evaluat[ing], monitoring, and treat[ing] inmates with chronic illness . . . due to poor or non-existent procedures and understaffing of guards and medical personel." *Id.* Shepherd also presented independent evidence of the deficiencies including investigative reports from the County and Department of Justice and affidavits

No. 11-10511, cons. with 11-10512

from employees of the jail and its medical contractor.  For example, the jail's pharmacist testified that "the administration of medication at the jail was so inadequate that, according to surveys he conducted, half or more of inmates did not receive their prescription medications."  *Id.* at 456.

Similarly, in *Duval v. Dallas County*, the plaintiff contracted a severe infection that was resistant to typical antibiotic treatment.  631 F.3d 203, 206 (5th Cir. 2011).  The plaintiff presented evidence that the jail had a "bizarrely high incidence" of the infection compared to other jails and that the County was aware of the problem, continued to house inmates in the face of the inadequately controlled infection, and knew how to control the infection but failed to implement known measures to eradicate or control the situation.  *Id.* at 208. This case lacks similar evidence of a systemic failure of emergency medical care at the Wichita County Jail.  We are therefore persuaded that the district court properly analyzed this case as an episodic acts case.

## IV.

We turn next to the issue of whether the district court properly granted summary judgment on the issue of qualified immunity in favor of Dr. Bolin.  In order to overcome the qualified immunity defense in an episodic acts case, Brown must prove that the official "acted or failed to act with deliberate indifference to the detainee's needs."  *Hare*, 74 F.3d at 648.  To establish deliberate indifference, the plaintiff must establish that the official knew of and disregarded an excessive risk of inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hare*, 74 F.3d at 648-49 (applying *Farmer* standard for convicted inmates in a condition of confinement case to pretrial detainee's claim of episodic act).  The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id.  Because Dr. Bolin was not directly involved in the events surrounding Brown's death and "liability under the doctrine of

8

respondeat superior is not cognizable in § 1983 actions," the plaintiffs' claims against Dr. Bolin are premised on supervisory liablity. *See Cozzo v. Tangipahoa Parish Council -Pres. Govt.*, 279 F.3d 273, 286 (5th Cir. 2002).

> An official
>
> not personally involved in the acts that deprived the plaintiff of [his] constitutional rights is liable under section 1983 if: 1) the [supervisor] failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights.

*Id.*, (citing *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 459 (5th Cir. 2001)). Proof of a single instance of constitutional violations resulting from alleged inadequate training will not ordinarily support a plaintiff's claim that lack of training caused the violation of his constitutional rights. *Id.* at 286-87. Rather, a pattern of similar violations is ordinarily required to sustain a plaintiff's burden of proof. *Id.*

Supervisory liability can also be established without direct participation in the alleged events "if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987)(internal quotations and citations omitted). An official policy is:

> 1. A policy statement, ordinance,  regulation, or decision that is officially adopted and promulgated by the [government entity] . . . or by an official to whom the [entity] has delegated policy-making authority; or
>
> 2. A persistent, widespread practice of . . . officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents [the entity's] policy.

No. 11-10511, cons. with 11-10512

*Cozzo*, 279 F.3d. at 289, quoting *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992). Existence of a constitutionally deficient policy cannot be inferred from a single wrongful act. *Thompkins*, 828 F.2d at 304.

Brown's evidence on summary judgment paints a picture of a system of medical care for prison inmates and detainees that has serious potential for the type of harm that befell Brown. Although the County has in place a General Order for Health Services, it was drafted by the Sheriff and the summary judgment evidence reflects that neither Dr. Bolin nor Nurse Krajca were aware of it. The General Order outlines circumstances in which an inmate should be transported for emergency medical care – including severe loss of blood. Dr. Bolin's contract with the County placed him in charge of the medical care for the inmates and charged him with supervision of the professional activities of the nurses. However, he did not review the nurses' decisions that occurred in his absence and performed no evaluations of the nurses' performance. The nurses were the first line providers of health care and Dr. Bolin became involved when the nurses called him.

The nurses who were charged with the gatekeeping function between the inmates and Dr. Bolin or medical care other than what could be provided via the standing orders were LVNs, licensed vocational nurses. According to the Texas Occupations Code for Health Profession, V.T.C.A. § 301.002(5), nurses with this qualification are not trained to diagnose patients or do procedures.[1] Rather, they

---

[1] The Texas Occupations Code for Health Professions defines Vocational Nursing as follows:

**§ 301.002. Definitions**

(5) "Vocational nursing" means a directed scope of nursing practice, including the performance of an act that requires specialized judgment and skill, the proper performance of which is based on knowledge and application of the principles of biological, physical, and social science as acquired by a completed course in an approved school of vocational nursing. **The term does not include acts of medical diagnosis or the prescription of therapeutic or corrective measures**. Vocational

No. 11-10511, cons. with 11-10512

are qualified to assess a patient's situation and report on the same. *Id.* Accordingly, Brown argues that allowing the LVNs to medicate detainees from the standing orders required them to perform medical care beyond their professional training. The summary judgment record also includes evidence that Dr. Bolin intimidated the nurses when they called him about inmate's medical needs.

Nurse Krajca, who observed Brown's condition, undoubtedly acted with deliberate indifference to Brown's medical needs. However, to find that Dr. Bolin was deliberately indifferent, there must be evidence from which we can conclude that Dr. Bolin was aware that the failure to properly train or supervise the nurses or that his other policies and procedures for medical care at the jail created a substantial risk of harm to the detainees and then acted with deliberate indifference to that risk. *Hare*, 74 F.3d at 650. The deliberate indifference standard is high. Negligence or even gross negligence is not enough.

---

nursing involves:

> (A) collecting data and performing focused nursing assessments of the health status of an individual;
>
> (B) participating in the planning of the nursing care needs of an individual;
>
> (C) participating in the development and modification of the nursing care plan;
>
> (D) participating in health teaching and counseling to promote, attain, and maintain the optimum health level of an individual;
>
> (E) assisting in the evaluation of an individual's response to a nursing intervention and the identification of an individual's needs; and
>
> (F) engaging in other acts that require education and training, as prescribed by board rules and policies, commensurate with the nurse's experience, continuing education, and demonstrated competency.

V.T.C.A., Occupations Code § 301.002(5). (emphasis added).

11

*Id.* at 645. "[T]he correct legal standard is not whether the jail officer [Dr. Bolin] 'knew or should have known,' but whether they had gained actual knowledge of the substantial risk of [denial of appropriate medical care as a result of current jail staffing and policies] and responded with deliberate indifference." *Id.*

The record contains no such evidence at the time of Brown's death. Dr. Bolin had no knowledge of Brown's medical problems before he died. The record contains no evidence of past instances where inmates suffered harm due to improper nursing assessment, treatment from the standing orders, or failure to call Dr. Bolin due to fear of reprimand. It also contains no evidence that Dr. Bolin knew that the system of medical care at the jail, including staffing and decision making by LVNs, had been assessed as deficient by any reviewing authority. See *Shepherd*, 591 F.3d at 453. In fact, the jail passed State certification. Accordingly, the district court did not err in granting summary judgment for Dr. Bolin on the issue of qualified immunity.

V.

For similar reasons, we conclude that the district court did not err in granting summary judgment for Wichita County on the issue of qualified immunity. A plaintiff seeking to hold a municipality liable under § 1983 must put on evidence demonstrating that (1) a policymaker; (2) exercised deliberate indifference in promulgating an unconstitutional policy; and (3) the unconstitutional policy was a moving force in the violation of an individual's constitutional rights. *Piotrowski v. City of Houston*, 237 F.3d 567, 578-79 (5th Cir. 2001). Even if we assume that Dr. Bolin can be a policymaker for purposes of imputing liability on the County, Brown's case fails for lack of evidence that the County exercised deliberate indifference in promulgating an unconstitutional policy. *Id.*

The existence of a constitutional violation and a municipality's liability for that violation are two separate issues. *Hare*, 74 F.3d at 649, n.4.

No. 11-10511, cons. with 11-10512

> Different versions of the deliberate indifference test govern the two inquiries. Our opinion in this case makes clear that to prove an underlying constitutional violation in an individual or episodic case, a pre-trial detainee must establish that an official acted with subjective deliberate indifference. Once the detainee has met this burden, she has proved a violation of her rights under the Due Process Clause. To succeed in holding a municipality accountable for that due process violation, however, the detainee must show that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the detainee's constitutional rights. See *Farmer*, 114 S.Ct. at 1981 ("It would be hard to describe the *Canton* understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective.").

*Id.*

In *Scott v. Moore*, 114 F.3d 51, 54 (5th Cir. 1997), this court analyzed whether the city's failure to adopt a policy of additional staffing to prevent sexual abuse of female detainees amounted to objective deliberate indifference as follows;

> First, there is no showing that the city had actual knowledge that its staffing policy created a substantial risk of harm to female detainees. To the contrary, the city had followed the same staffing procedures since the late 1970's without any incident and had received no complaint of sexual assault by a jailer prior to this incident.

*Id.* Further the jailers underwent a background investigation, medical exam and polygraph test which revealed no cause for concern. The specific jailer in question had served for four years as a commissioned police officer without incident and had been trained by experienced jailers in the official policies of the jail. See also *Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998)(No evidence showing that the city was aware of the supposedly high stress levels in the New Orleans Police Department or knowledge that the absence of a stress

No. 11-10511, cons. with 11-10512

management program was likely to endanger the constitutional rights of its citizens.)

As stated above, the record contains no evidence of failure of the system of medical care at the Wichita County Jail that would indicate that the County was deliberately indifferent in maintaining that policy. Accordingly, we conclude that the district court did not err in granting summary judgment on the issue of qualified immunity in favor of the County.

VI.

Although we reach these conclusions based on the facts available to Dr. Bolin and the County at the time of Brown's incarceration, this holding is not approval of the medical care provided by Dr. Bolin or the Wichita County Jail. As pointed out by the plaintiffs, there have been two documented cases of improper assessment by the nursing staff at the jail since Brown's death which could be viewed as evidence that the nurses do not have the proper training to recognize critical medical situations. These incidents may be sufficient to put the Sheriff, Dr. Bolin and the County on notice that their present policies may be likely to endanger the constitutional rights of the inmates in the Wichita County Jail. However, based on the record in this case, we affirm the judgment of the district court granting qualified immunity to these defendants. AFFIRMED.

No. 11-10511, cons. with 11-10512

DENNIS, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority's holding that Wichita County cannot be held liable as a municipality under 28 U.S.C. § 1983 for the death of Jason Ray Brown. Actions by those with final authority for making a decision in the municipality constitute an official policy of the municipality for purposes of § 1983.[1] For the reasons given below, I believe that the alleged facts concerning Dr. Bolin's actions present a submissible case of his liability for Brown's death. However, Dr. Bolin is a contract employee of the County, not a final decisionmaker of the County, and as such his actions would not give rise to liability on the part of the County.[2] Sheriff Callahan is a final decisionmaker of the Wichita County Jail,[3] and this panel is bound by the panel's decision in *Brown v. Callahan*, 623 F.3d 249, 252 (5th Cir. 2010) (*Brown I*) that Sheriff Callahan was entitled to qualified immunity. I continue to disagree with the holding in *Brown I*.[4] However, I agree with the majority's implicit premise in this case that we are bound by the panel's holding in *Brown I* that Sheriff Callahan lacked the requisite knowledge or notice to satisfy supervisory liability; therefore, I agree that the County cannot be held liable for Sheriff Callahan's decisionmaking with regard to medical care administered in this case. I therefore concur in the majority's holding as to Wichita County.

---

[1] *E.g.*, *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).

[2] *Cf. Mandel v. Doe*, 888 F.2d 783, 794 (11th Cir. 1989) (holding that a physician's assistant was the "sole and final policymaker with respect to medical affairs at [a] . . . prison" where "the County had entered into a Memorandum of Understanding with the health department and had established a policy that medical care for inmates at the . . . prison would be provided by [the] physician's assistant" and where he was "authorized to function without any supervision or review at all").

[3] *See Turner v. Upton Cnty.*, 915 F.2d 133, 136 (5th Cir. 1990).

[4] *See id.* at 359 (Dennis, J., dissenting).

No. 11-10511 c/w No. 11-10512

However, I respectfully dissent from the majority's decision to immunize Dr. Bolin for his own role in the death of Jason Ray Brown. The majority holds that, although Nurse Krajca was deliberately indifferent to Brown's obviously exigent medical circumstances, Dr. Bolin should not be held liable because there was insufficient evidence that he knew his policy of nighttime inaccessibility for medical advice or authorization of emergency hospitalization would cause substantial risk of harm to prisoners due to their inadequate medical treatment at the jail. In my view, a jury could reasonably find that Dr. Bolin had a practice of intimidating nurses to prevent them from calling him or sending inmates to the hospital when they became dangerously ill; and that as a medical doctor, Dr. Bolin must have known that the effect of his conduct would be to endanger the lives of those detainees, but was deliberately indifferent to that risk. I would therefore reverse the judgment of the trial court and remand the case to allow a jury to decide whether Dr. Bolin should be held responsible for Brown's death.

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court recognized that the Eighth Amendment requires the government to provide medical care to inmates because the failure to do so "may actually produce physical 'torture or a lingering death'" or unnecessary "pain and suffering." *Id.* at 103 (citation omitted). We have held that the Fourteenth Amendment confers the same right to pretrial detainees, who have a well-established constitutional right to be free from pain, suffering, and death due to the denial of adequate medical care while they are incarcerated. *Hare v. City of Corinth*, 74 F.3d 633, 649 (5th Cir. 1996).

A prison official may be held liable for his or her policy affecting pretrial detainees that deprives them of basic human needs, including adequate medical care, if the official knew of a substantial risk of harm to detainees but responded with deliberate indifference to that risk. *Id.* In such a situation, the official's "policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Cozzo v. Tangipahoa Parish Council-President*

16

*Gov't*, 279 F.3d 273, 289 (5th Cir. 2002) (quotation marks omitted).  To prevail, a § 1983 "claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).  "[I]t does not matter whether . . . a prisoner faces an excessive risk of [harm] for reasons personal to him or because all prisoners in his situation face such a risk."  *Id.* at 843.  We do "not require a prisoner seeking a remedy for unsafe conditions to await a tragic event such as an actual assault," or, as here, a death, " before obtaining relief."  *Id.* at 845 (citation, quotation marks and alterations omitted).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Id.* at 842 (citations omitted); *see also, e.g.*, *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (same).[5]  In other words, "a trier of fact may infer

---

[5] *See also, e.g.*, *Nelson v. Corr. Med. Services*, 583 F.3d 522, 530 & n.5 (8th Cir. 2009) (forcing female inmate to give birth with both of her legs shackled involved obvious medical risks) (citing *Farmer*, 511 U.S. at 842); *Vaughn v. Gray*, 557 F.3d 904, 909-10 (8th Cir. 2009) (holding that prison officials were not entitled to qualified immunity because it was obvious that a moderately obese and mentally unstable inmate who had consumed shampoo and begun vomiting was at risk for a heart attack, which created a question of fact for the jury) (citing *Farmer*, 511 U.S. at 842); *Bozeman v. Orum*, 422 F.3d 1265, 1272-73 (11th Cir. 2005) (delay in  administering or seeking medical assistance for an inmate who appeared to have asphyxiated involved obvious risk to the inmate's health) (citing *Farmer*, 511 U.S. at 842); *Lolli v. County of Orange*, 351 F.3d 410, 420-21 (9th Cir. 2003) (holding that prison officials were not entitled to qualified immunity because it was obvious that a pretrial detainee suffering from diabetes needed food, and that therefore a jury could find that the officials "inferred from this information that [the plaintiff] was at serious risk of harm if he did not receive the food") (citing *Farmer*, 511 U.S. at 842); *LeMarbe v. Wisneski*, 266 F.3d 429, 436-38 (6th Cir. 2001) (holding a prison physician was not entitled to qualified immunity for his inadequate treatment of an inmate's serious abdominal condition because he "failed to take the action that his training indicated was necessary" and "the risk of harm . . . was extreme and obvious to anyone with a medical education and to most lay people" such that "a factfinder may conclude that [he] knew of a substantial risk from the very fact that the risk was

knowledge from the obvious[.]" *Farmer*, 511 U.S. at 844; *see also id.* (citing Wayne R. LaFave & Austin W. Scott, Jr., 1 Substantive Criminal Law § 3.7, at 335 (1986) ("[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of.")). For instance, a defendant could "not escape liability if the evidence showed that he . . . refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist[,] . . . [as] when a prison official knows that some diseases are communicable and that a single needle is being used to administer flu shots to prisoners but refuses to listen to a subordinate who he strongly suspects will attempt to explain the associated risk of transmitting disease[.]" *Farmer*, 511 U.S. at 843 n.8. Knowledge is thus a question for the jury. *See id.* at 843 & n.8.

The plaintiffs have alleged that Dr. Bolin implemented a policy discouraging nurses from permitting access to necessary life-saving medical treatment to seriously ill pretrial detainees. There is concrete, specific evidence in the record that Dr. Bolin maintained such a policy, creating dangerous conditions for critically ill inmates in the jail. Two former jail nurses attested that Dr. Bolin discouraged them from calling him for advice at nighttime, and they described two incidents in which they consulted Dr. Bolin about an inmate's medical condition and were instructed not to send the patient to the emergency room for treatment. When the nurses did so anyway, it led to a confrontation with Dr. Bolin in which they attested that they felt bullied and intimidated. The nurses attested that they witnessed Dr. Bolin's similar intimidation and

---

obvious") (quoting *Farmer*, 511 U.S. at 842); *Oxendine v. Kaplan*, 241 F.3d 1272, 1278-79 (10th Cir. 2001) (holding that the failure to refer an inmate to a specialist after he showed signs of necrosis following a surgical procedure posed an obvious health risk).

mistreatment of other nurses on the jail staff. Nurse Krajca, who oversaw Jason Brown's treatment, attested that she did not send Brown to the emergency room because she did not want an "ass-chewing" from the doctor. Specifically, after Nurse Krajca ordered Brown transferred to a medical solitary cell, she stated to a detention officer during a cigarette break: "Do you know what kind of ass-chewing I would get from Dr. Bolin if I sent [Brown] to the hospital in the good health that he is in?'"

Thus, the plaintiffs introduced evidence indicating that Dr. Bolin's well-known policy of unavailability for consultations at night, coupled with his strong disapproval of emergency hospitalization of prisoners without his assent, created a dilemma for the nurses and caused Nurse Krajca to deny Brown necessary, life-saving medical treatment. The plaintiffs therefore introduced evidence that Dr. Bolin's policy violated Brown's constitutional right to emergency medical care. Accordingly, there are genuine disputes as to material facts, *viz.*, whether Dr. Bolin by his policy knowingly created a risk of serious harm or death to prisoners, was deliberately indifferent to that risk, and thereby caused Nurse Krajca's failure to secure for Brown the emergency medical attention that he obviously needed. In my view, a reasonable jury could find that Dr. Bolin had such a policy that created an undue risk to inmates' health and safety, that he was deliberately indifferent to that risk, and that the policy deprived Brown of his constitutional rights and led to Brown's death.

I disagree with the majority's conclusion that there was insufficient evidence that Dr. Bolin knew his policy of nighttime inaccessibility would cause substantial risk of harm to prisoners due to their inadequate medical treatment at the jail. The plaintiffs presented evidence that Dr. Bolin's actions endangered all inmates and that such a risk was obvious. The majority impermissibly erects a bar to the plaintiffs' ability to demonstrate Dr. Bolin's knowledge "in the usual

ways, including inference from circumstantial evidence [and] . . . the obvious." *Id.* at 842-44.

Dr. Bolin was a trained medical doctor. A jury could reasonably find that this substantial risk of harm to prisoners was obvious to Dr. Bolin. He took no steps to mitigate or otherwise prevent the serious harm that awaited inmates when they were not sent to the emergency room for their critical conditions, even though the risk was brought to his attention by the nurses on his staff. Moreover, Dr. Bolin knew that the nurses at the county jail were not equipped or qualified to administer emergency treatment on their own; even worse, Dr. Bolin had openly adopted a policy of refusing to respond to the nurses' requests for advice and assistance. Dr. Bolin's knowledge may be established by reference to circumstantial evidence and inferences from the concrete evidence of Dr. Bolin's behavior and its effect. Like a prison official who "knows that some diseases are communicable and that a single needle is being used to administer flu shots to prisoners[,]" *id.* at 843 n.8, Dr. Bolin, a medical doctor, was faced with the obvious risk of inadequate care for serious medical emergencies that would arise and in fact proceeded to deliberately disregard that risk despite the nurses' protestations. Under those conditions, the inmates were virtually certain to be denied proper medical treatment for their life-threatening conditions. A reasonable jury could find that such actions created an obvious risk of danger to the inmates in the jail's care.

Other circuits have permitted suits to go forward against prison supervisors for their own policies of deliberate indifference to inmates' safety and medical needs when the officials' alleged conduct created an obvious risk. For example, in *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999), an inmate with a history of stomach problems began suffering from severe abdominal pain and vomiting while incarcerated; it was later determined that the inmate was suffering from colon cancer. *Id.* at 1251-52. Based on telephone calls to the

supervising physician and standing orders, the nurses at the prison placed the inmate on a liquid diet and gave him Pepto-Bismol, Tylenol, and anti-gas medication to treat his increasingly severe symptoms. *Id.* at 1251-54. The supervising physician saw him infrequently in the course of several months and did not proscribe stronger medication or order further exams, despite the inmate's worsening symptoms. *Id.* The Court of Appeals held that the nurses were deliberately indifferent to the inmate's medical needs because he was obviously in pain and in need of a more efficacious course of treatment. *Id.* at 1256-58. The court also held that the physician was deliberately indifferent notwithstanding the fact that the physician claimed that he did not have the requisite knowledge of the inmate's condition. *Id.* at 1257-58. The physician was aware that the inmate was in considerable pain even though he saw him infrequently, and, importantly, the long delays between visits themselves caused the inmate unnecessary suffering. *Id.* As the court explained, the inmate "often had to wait in great pain in order even to be seen by [the doctor]. A jury could find that these delays evidence the defendants' deliberate indifference." *Id.* at 1258. The court further observed, in response to the physician's "suggest[ion] that these delays occurred because of decisions by the nursing staff," that the physician "set up the system in which the nursing staff responds, without review by [the doctor], to requests to see him. . . . [A]n official does not insulate his potential liability for deliberately indifferent actions by instituting a policy of indifference." *Id.* at 1258 n.7 (quotation marks omitted).

Similarly, in *Clark-Murphy v. Foreback*, 439 F.3d 280 (6th Cir. 2006), an inmate died of dehydration in his cell during an intense psychotic episode lasting several days; jail officials filled out a psychiatric referral form but did not actively follow up on the request for psychiatric help or ensure that the inmate was capable of remaining fed and hydrated during the episode. *Id.* at 282-83. The Sixth Circuit held that there was a triable issue of fact as to the liability of

eleven of the defendants involved, including several officers, nurses, a psychologist who saw the inmate, and a supervisor who did not respond to an email regarding the need for a psychiatric referral. *Id.* The court held that the various officials were not entitled to qualified immunity because "for summary-judgment purposes, [the] . . . defendants could have perceived a substantial risk of serious harm to [the plaintiff]. Whether in fact they perceived, inferred or disregarded that risk is an issue for trial. 'Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Id.* (alteration omitted) (quoting *Farmer*, 511 U.S. at 842).[6]

The majority's judgment that Dr. Bolin did not know or appreciate the likely consequences of his alleged policy discouraging nurses from administering proper treatment to inmates is contrary to the Supreme Court's pronouncement in *Farmer* that a jury must decide questions of deliberate indifference when a risk of harm to inmates is obvious, and it sets us apart from other courts that have confronted similar situations. Similar to the situation in the Wichita County Jail, the jail physician in *McElligott* set up a system by which the nurses had too much discretion to deny care and in which the physician would rarely treat the inmates himself although only the physician had the authority to

---

[6] *See also, e.g.*, *Thomas v. Bryant*, 614 F.3d 1288, 1313-16 (11th Cir. 2010) (denying qualified immunity to jail officials in a suit challenging the officials' policy of indiscriminate use of chemical agents against inmates where the officials "'turned a blind eye' to [the plaintiff's] mental health needs and the obvious danger that the use of chemical agents presented to his psychological well-being [because] [t]urning a blind eye to such obvious danger provides ample support for the finding of the requisite recklessness") (citing *Farmer*, 511 U.S. at 842); *Calderon-Ortiz v. LaBoy-Alvarado*, 300 F.3d 60, 66 (1st Cir. 2002) (in a prison sexual assault case, denying qualified immunity to prison officials who "followed a practice of not enforcing policies of the . . . Administration of Correction of Puerto Rico to ensure that weak, vulnerable inmates are housed separately from stronger, dangerous inmates") (alterations omitted).

prescribe more serious medications and treatments. *See McElligott*, 182 F.3d at 1258 & n.7. Thus, although the physician in *McElligott* actually saw the patient, though infrequently, that was not determinative in the Eleventh Circuit's view. *See id.* at 1258 & n.7. Rather, the physician was not entitled to qualified immunity because he "set up the system in which the nursing staff responds, without review by [the doctor], to requests to see him" and for that reason could "not insulate his potential liability for deliberately indifferent actions by instituting a policy of indifference." *Id.* (quotation marks omitted).[7] Likewise, in *Clark-Murphy*, the Sixth Circuit denied summary judgment to a jail psychologist and supervisor who did not respond to an email requesting care for the inmate because a jury could reasonably find that those jail officials were deliberately indifferent based on circumstantial evidence or the fact that the risk their conduct posed to the inmate's health was "'obvious.'" 439 F.3d at 282-83 (quoting *Farmer*, 511 U.S. at 842).

Here, as in the foregoing cases, the plaintiffs have submitted sufficient evidence that would allow a jury to reasonably conclude that Dr. Bolin's alleged policy of nurse intimidation posed an obvious risk to the inmates at the Wichita County Jail. The majority impermissibly imposes a barrier to the plaintiffs' ability to demonstrate Dr. Bolin's knowledge "in the usual ways," based on inference from circumstantial evidence and the obvious nature of the risk. *Farmer*, 511 U.S. at 842-44. Dr. Bolin should not be permitted to "turn[] a blind eye" to inmates' medical needs[8] or to "insulate [himself] . . . by instituting a policy of indifference."[9]

---

[7] *See also Farmer*, 511 U.S. at 843 ("[I]t does not matter whether . . . a prisoner faces an excessive risk of [harm] for reasons personal to him or because all prisoners in his situation face such a risk.").

[8] *Thomas*, 614 F.3d at 1316.

[9] *McElligott*, 182 F.3d at 1258 & n.7.

No. 11-10511 *c/w* No. 11-10512

The circumstances surrounding Brown's death are disturbing, but unfortunately they are not unique. Since Brown's death, at least two other detainees, including Chelsea Bowden and Wilbert Henson, have suffered extremely serious medical mistreatment in the Wichita County Jail, resulting in Bowden's life-threatening illness and Henson's death.[10] Because there are genuine disputes as to material issues of fact, as well as permissible inferences and ambiguities that must be resolved in the nonmovant's favor, Dr. Bolin was not entitled to summary judgment on the record presented.

---

[10] *See Estate of Henson v. Callahan*, 440 F. App'x 352 (5th Cir. 2011); *Estate of Henson v. Krajca*, 440 F. App'x 341 (2011); *Brown v. Wichita Cnty.*, No. 7:05-CV-108-O, 2011 WL 1562567 (N.D. Tex. Apr. 26, 2011).